IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES ANASTOS,
     Plaintiff,

v.

IKEA PROPERTY, INC. and IKEA NORTH
AMERICA SERVICES, LLC,
     Defendants.

Civil Action No.
1:19-cv-3702-SDG

## OPINION AND ORDER

This matter is before the Court on Defendants IKEA Property, Inc. and IKEA

North America Services, LLC's (together, IKEA) summary judgment motion

[ECF 71] and motion for leave to file matters under seal [ECF 74], as well as

Plaintiff James Anastos's motion to strike IKEA's notice of supplemental authority

[ECF 92]. After careful consideration of the record, IKEA's summary judgment

motion and motion to seal are **GRANTED**, and Anastos's motion to strike is

**DENIED**.

## I.    BACKGROUND

This case arises under the Employee Retirement Income Security Act of

1974, 29 U.S.C. §§ 1001, *et seq.* (ERISA). The following facts are undisputed unless

otherwise noted.

## A.    The Offer

In 2017, IKEA began a major reorganization.[1] As part of the reorganization IKEA gave a group of employees a choice: relocate to Philadelphia, or accept a "Voluntary Alternative Offer" (the Offer) and eventually separate from the company in exchange for a severance payment.[2] Anastos was affected by the reorganization, and, after twenty-five years with IKEA, opted not to relocate.[3] Instead, he accepted the Offer, signed IKEA's requisite waiver and release including a "general release of claims" (the Release), and retired on May 3, 2018.[4]

## B.    The Plan

During his employment, but before he accepted the Offer and retired, Anastos participated in the IKEA Benefits Plan (the Plan) for basic life insurance, supplemental life insurance, and dependent life insurance.[5] The Plan stated that "Basic Life Insurance is **NOT** Portability Eligible Insurance."[6] The Plan also contained a section dedicated to conversion of policies when an employee's life

---

[1]   ECF 80, ¶ 30.

[2]   *Id.* ¶¶ 30–31.

[3]   *Id.* ¶ 32.

[4]   *Id.* ¶¶ 32–33; ECF 88, ¶ 32.

[5]   ECF 40, ¶ 59; ECF 88, ¶ 17 ("IKEA had offered basic life insurance, supplemental health insurance, and dependent life insurance for decades.").

[6]   ECF 80, ¶ 3.

insurance ended or was reduced.[7] The Plan provided that the new policy could be "on any form then customarily offered by [IKEA] excluding term insurance."[8] The Plan also contains a summary plan description that states that the "MetLife certificate describes the eligibility requirements for insurance provided by MetLife under the plan."[9]

### C.  The Policy

IKEA also offered the Retiree Recognition Policy (the Policy), which set the eligibility for IKEA retiree status and defined the "non-financial" benefits offered to retirees.[10] It is undisputed that Anastos qualified for the Policy's benefits upon retirement.[11] The Policy's benefits were posted on IKEA's iCoworker platform. Chief among them, and central to this case, the Policy provided:

> (1)    "Within 7–10 days of retirement, retirees will receive information from the life insurance vendor regarding their option to continue their basic and/or supplemental life coverage for themselves and any eligible dependents";[12]

---

[7]    ECF 72-2, at 63.

[8]    *Id.*

[9]    *Id.* at 74.

[10]    ECF 80, ¶ 13.

[11]    ECF 72-4; ECF 88, ¶ 10.

[12]    ECF 72-3 (Policy), at 3.

(2)     "[m]ost of these options are guaranteed issue, which means, no medical certification will be required and the costs are similar to what was paid while employed with IKEA."[13]

## D.    Anastos's Inquiry Regarding Policy Benefits

Anastos believed the Policy meant that, once retired, he could buy his basic and supplemental life insurance benefits at IKEA's group rates.[14] Before he accepted the Offer and retired, Anastos contacted two IKEA employees to confirm his understanding of the post-retirement life insurance coverage options under the Policy.[15]

First, on August 18, 2017, Anastos emailed Eileen Scoggins, a contractor whom IKEA retained to help manage employee benefits.[16] She advised Anastos that he could **convert** his basic life coverage to an individual policy, and that his supplemental life coverage would end upon retirement; that is, his insurance under the Plan was not portable.[17] She also advised that Anastos would receive a package of information from MetLife after retirement regarding "a new Voluntary

---

[13]   *Id.*

[14]   ECF 72-5, at 4; *see also* ECF 82 (Anastos Decl.), ¶ 9.

[15]   ECF 72-5, at 4.

[16]   *Id.*; ECF 80, ¶ 22.

[17]   ECF 72-5, at 2; ECF 80, ¶ 22.

Retiree Life coverage," including coverage amounts and eligibility dates; that MetLife's "financial professionals" were now with MassMutual; and that, as he was planning for retirement, he could contact MassMutual directly at any time to obtain an estimated rate.[18] Anastos pointed out that the information in the Policy appeared to conflict with Scoggins's account, but Scoggins indicated that her information was "from MetLife directly."[19] Anastos "wrote [Scoggins] off," believing "she didn't know what she was talking about."[20]

Second, on August 23, 2017, Anastos emailed his retired former colleague, Ella Hullfish.[21] In his email, he recounted what Scoggins wrote and indicated his belief that the information was "opposite of what [was] stated on iCoworker."[22] Hullfish cautioned, "[D]on't trust anyone," and advised him to reach out to MetLife directly.[23] Later, on August 29, Hullfish wrote, "It sounds like they changed life insurance companies. So, yes . . . call them."[24]

---

[18]   ECF 72-5, at 2; ECF 80, ¶ 23.

[19]   ECF 72-6, at 2.

[20]   ECF 72, ¶ 26.

[21]   ECF 72-7, at 4.

[22]   *Id.*

[23]   *Id.* at 2–3.

[24]   *Id.* at 1.

There is no evidence that Anastos contacted MetLife or MassMutual before he accepted the Offer, or otherwise attempted to clarify whether Scoggins's explanation of his benefits under the Policy was accurate; Anastos "didn't believe it would be helpful."[25]

### E.   Anastos's Retirement and Attempts to Collect Benefits Under the Policy

Anastos signed the Offer on October 5, 2017,[26] and retired on May 3, 2018.[27] He alleges that—before his retirement, but after he accepted the Offer—he twice met with Amy Vernon, IKEA's Human Resources Manager: once in April 2018, and once on May 3, 2018, his last day of employment.[28] He insists that, at both meetings, Vernon reviewed the Policy, confirmed Anastos's understanding that he could port his Plan insurance per the Policy, and "directly refuted the information . . . from Ms. Scoggins in 2017."[29] According to Anastos, Vernon "specifically confirmed [his] eligibility for continuation of [his] three Term Life

---

[25]   ECF 72, ¶ 29.

[26]   ECF 80, ¶ 33.

[27]   ECF 40, ¶ 2.

[28]   ECF 82, ¶¶ 36–41.

[29]   *Id.* ¶ 37.

Insurance policies, and assured [him] that Met[L]ife would send [him] a packet of information as outlined in the [Policy]."[30]

After Anastos retired he received a letter from IKEA dated May 10, 2018, that allegedly confirmed his understanding of the Policy, and enclosed a retiree ID card, which listed the Policy's benefits and relevant contacts.[31] However, he alleges that, in the 7–10 days following his retirement, he did not receive any correspondence from MetLife or MassMutual regarding his post-retirement insurance options.[32] He further alleges that, on or about May 17, 2018, he and his spouse began to contact MetLife and IKEA's Benefits Department, and that his spouse called MetLife at least three times after May 17.[33]

### 1. MetLife's Letter

Anastos's spouse continued a back-and-forth with IKEA personnel regarding Scoggins's explanation of benefits.[34] At some point, Debra Packel, Benefits Manager for IKEA, asked MetLife to look into and expedite Anastos's

---

[30]   *Id.* ¶ 40.

[31]   *Id.* ¶¶ 42–43.

[32]   *Id.* ¶ 44.

[33]   *Id.* ¶ 45; ECF 88, ¶ 49.

[34]   ECF 80, ¶ 37.

retirement package.[35] Amid this back-and-forth, Anastos received a letter from MetLife (the MetLife Letter) dated June 14, 2018, detailing his post-retirement life insurance options.[36] The MetLife Letter offered Anastos a conversion option of $437,000 in basic life insurance coverage without a medical examination, or a "Voluntary Retirement Life" (VRL) option.[37] There was no option to port his basic and supplemental insurance and continue buying either or both at IKEA's group rates; rather, the letter explained that if Anastos converted his group coverage, the group coverage would end, and he would start an individual life insurance policy.[38] The MetLife Letter advised that Anastos should respond by August 14, 2018 to take advantage of any benefits described in the letter.[39]

On July 25, 2018, Anastos emailed Packel to discuss the MetLife letter. Over the next few days, Anastos and IKEA exchanged emails. Anastos insisted he was entitled to the same life insurance policies at the same rates, and IKEA explained that the "continuation options are to convert the policy to an individual policy or purchase a new VRL policy," consistent with the MetLife Letter and Scoggins's

---

[35]  *Id.*

[36]  ECF 72-10; ECF 80, ¶ 36.

[37]  ECF 72-10, at 3.

[38]  *Id*.

[39]  *Id.*

account.[40] IKEA maintains that Anastos did not respond to MetLife by August 14. Anastos disputes that allegation, and insists that he applied to convert his IKEA policies to an individual policy, which—contrary to IKEA's representations— required him to fill out a health questionnaire.[41] Anastos received a rejection letter from MetLife on September 4.[42]

### 2. The 2016 Policy Change

In an August 30, 2018 email, IKEA acknowledged internally that, "effective for 2016[,] M[et]L[ife] started to offer the VRL program in conjunction with removal of retirement as a port-eligible event," and recommended that IKEA communicate this change to employees to "ensure consistency with actual M[et]L[ife] coverage arrangements and policy terms."[43]

On September 28, 2018, Packel explained to Anastos that "IKEA had offered portability of supplemental and dependent life insurance for retirees up until January 1, 2016," and that basic life insurance was never eligible to be ported.[44]

---

[40]   *See generally* ECF 72-12.

[41]   ECF 82, ¶¶ 48–51.

[42]   ECF 82-6.

[43]   ECF 85-9.

[44]   ECF 72-12, at 2.

She acknowledged that "the IKEA Retiree FAQ was not updated to reflect the [2016] change regarding portability and Voluntary Retiree Life for retirees."[45]

### 3.    MetLife's Amended Insurance Package

In the same September 28 communication Packel also informed Anastos that there was a "data error" whereby "MetLife only offered [Anastos] the option to convert [his] basic life insurance," and that MetLife was "reopening [his] conversion option enrollment period and [would] send out a new package on September 28, 2018 with a new 15-day timeline."[46] According to IKEA, under the new package (the Amended Insurance Package), Anastos would "have the option to convert up to the total amount of [his] basic, supplemental and spouse coverage," and that "[e]vidence of insurability [was] not required."[47] She also

---

[45]  *Id.* The FAQ explained that retirees would "be given the option to convert (basic life) or port (supplemental life) your current life insurance through MetLife," which more closely approximates Anastos's understanding of the Policy. ECF 72-4, at 2. However, Anastos objects to the Policy FAQ (ECF 72-4) on foundational grounds and insists it has not been authenticated. *See* ECF 80, ¶ 19. The Court overrules this objection since the document could be reduced to admissible form at trial. *Carrizosa v. Chiquita Brands Int'l, Inc.*, --- F.4th ---, No. 19-13926, 2022 WL 4075342, at *8 (11th Cir. 2022) (stating that "evidence that can be reduced to an admissible form at trial should be considered at summary judgment") (citing *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021)).

[46]  ECF 72-12, at 2.

[47]  *Id.*

informed Anastos that IKEA was unable to offer retirees the ability to port their supplemental life insurance, as it was "required to follow the terms of the MetLife Certificate."[48]

Anastos believed there was "no point" in contacting MetLife to discuss the Amended Insurance Package.[49] IKEA insists that MetLife sent the Amended Insurance Package, totaling $904,000 in life insurance benefits. Anastos contends that he never received it, and does not dispute that he never enrolled in insurance via the Amended Insurance Package.[50]

### 4.   Escalation of Anastos's Claim

Because Anastos believed the Policy made clear that he was entitled to the Plan's benefits after his retirement, he disputed his denial of coverage under the Plan. On October 18, 2018, Anastos informed IKEA that he understood the Policy provided him with portable life insurance, and stated that it was a "KEY FACTOR" in his choice to accept the Offer.[51] That day, IKEA's benefits manager internally discussed changes to the Policy, recommending clarifying that retiring

---

[48]   *Id.*

[49]   ECF 80, ¶ 55.

[50]   *Id.* ¶¶ 58–59.

[51]   *Id.*

IKEA employees did not have an unfettered "option to *continue*" their insurance policies, but rather that they had an "option to *convert*," and that they would also "receive information about the Voluntary Retiree Life (VRL) plan."[52]

Later, on November 12, Anastos received a letter from Simon Lowes, Country HR Manager of IKEA, reiterating that he was not entitled to port his basic, supplemental, and dependent life insurance, which would have been reduced under the Plan once he reached 65 even if he had still been an IKEA employee.[53]

### F.    Procedural History

On August 16, 2019, having exhausted all administrative remedies, Anastos filed this lawsuit, asserting claims for unlawful denial of ERISA benefits and promissory estoppel.[54] On August 31, 2020, IKEA filed its first motion to dismiss for failure to state a claim.[55] Anastos responded by timely filing the Amended Complaint, dropping the promissory estoppel cause of action, and asserting only

---

[52]   ECF 85-7.

[53]   ECF 72-16.

[54]   ECF 1.

[55]   ECF 31.

a claim for unlawful denial of ERISA benefits under the Policy.[56] On October 1, IKEA renewed its motion to dismiss,[57] which the Court denied.[58]

On November 29, 2021, IKEA moved for summary judgment.[59] IKEA also moved for leave to file an unredacted version of Anastos's deposition under seal in support of its summary judgment motion.[60] IKEA followed these motions with a notice of supplemental authorities on March 14, 2022,[61] and, on May 24, Anastos moved to strike that filing.[62]

## II.   Discussion

### A.   Preliminary Issues

#### 1.   IKEA's Motion for Leave to File Matters Under Seal

IKEA filed an unopposed motion seeking leave of court to file under seal an unredacted transcript of Anastos's deposition, Exhibit A to IKEA's Statement of Undisputed Material Facts in support of its summary judgment motion.[63] IKEA

---

[56]   *See generally* ECF 40.

[57]   ECF 45.

[58]   ECF 56.

[59]   ECF 71.

[60]   ECF 74.

[61]   ECF 90.

[62]   ECF 92.

[63]   *See generally* ECF 74-1.

represents that the deposition transcript contains sensitive information about Anastos's health.[64]

Other courts in this district have granted similar motions under like circumstances. *See, e.g.*, *Reid v. Viacom Int'l Inc.*, Civ. A. No. 1:14-CV-1252-MHC, 2016 WL 4157208, at *4 (N.D. Ga. Jan. 25, 2016) (granting a motion to seal information related to "Plaintiff's personal health information"). The Court agrees that Anastos has a legitimate privacy interest in this information and that the information is entitled to protection. Accordingly, for good cause shown, and pursuant to Fed. R. Civ. P. 26(c), the motion is **GRANTED**.[65]

### 2. Anastos's Motion to Strike IKEA's Notice of Supplemental Authority

More than fifty days after IKEA filed its notice of supplemental authority,[66] Anastos filed a motion to strike it.[67] The motion is **DENIED**. Motions to strike are procedurally improper for the relief sought here. Rule 12(f) permits the Court to "strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). Since

---

[64]   *See generally id.*

[65]   ECF 72-1; ECF 74.

[66]   ECF 90.

[67]   ECF 92.

Rule 12(f) only contemplates striking material from a pleading, judges in this district routinely find that a motion to strike "is not the appropriate vehicle for challenging the consideration of evidence." *Green v. ADCO Int'l Plastics Corp.*, No. 1:17-cv-337-WSD-LTW, 2017 WL 8810690, at *5 (Dec. 27, 2017), *report and recommendation adopted*, 2018 WL 739794 (N.D. Ga. Feb. 7, 2018); *see also S. River Watershed All., Inc. v. DeKalb Cnty., Ga.*, 484 F. Supp. 3d 1353, 1362 (N.D. Ga. 2020) (quoting *Nelson v. Jackson*, No. 1:14-cv-02851-ELR-JFK, 2016 WL 9454420, at *1 (May 18, 2016), *report and recommendation adopted as modified*, 2016 WL 9455425 (N.D. Ga. June 30, 2016) ("[M]otions, briefs or memoranda, objections, or affidavits may not be attacked by the motion to strike.")). On this basis, and because Anastos "has no objection to submitting this case to the Court's attention,"[68] the motion to strike is **DENIED**.

However, the Court observes the crux of Anastos's objection, which is that IKEA's notice of supplemental authority contains arguments not raised previously and is tantamount to an impermissible sur-reply filed without leave of court.[69] The Court disagrees. IKEA's notice does not raise any point that was not already made

---

[68]   *See generally* ECF 92.

[69]   *Id.*

in its summary judgment motion and reply brief.[70] *Cf. Williams v. Heritage Operating, L.P.*, No. 8:07CV977 T24MSS, 2007 WL 2302131, at *1 (M.D. Fla. Aug. 8, 2007) (denying motion to strike notice of supplemental authority because it did not raise an argument not already included in the plaintiff's motion to remand).

### B.   Summary Judgment

#### 1.   Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324. In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in

---

[70]   ECF 71-1, at 1–2; ECF 89, at 11 n.3 (citing ECF 72-2, at 74).

favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999).

### 2.    Discussion

IKEA argues that Anastos's claim fails because (1) he released all claims against IKEA; (2) the Policy is not a plan under ERISA; (3) Anastos cannot rely on the Policy as a "summary plan description"; and (4) even if the Policy were a plan under ERISA, it would not provide the benefits to which Anastos believes he is entitled.[71]  For his part, Anastos insists that "the question comes down to whether a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."[72] Because IKEA's first two arguments are threshold and dispositive issues, the Court need not address its latter two arguments.

### *i.*    **Anastos's ERISA Claim Is Not Precluded by the Release.**

IKEA first argues that the Release extinguished the instant ERISA claim. Anastos responds that IKEA has not established his waiver and release of the ERISA claim, which accrued after he executed the Release and, correspondingly,

---

[71]   ECF 71, at 14.

[72]   ECF 87, at 3.

was not covered by the Release. In essence, IKEA asks the Court to rehash its motion to dismiss ruling. With discovery having closed and nothing materially different about IKEA's argument, the Court does so only briefly.

When he accepted the Offer, Anastos agreed to the Release, which released IKEA from liability for:

> any and all claims, known and unknown, asserted or unasserted, which [ ] James Anastos has or may have against Releasees as of the date of execution of this Agreement and General Release, including, but not limited to . . . The Employee Retirement Income Security Act (except for any vested benefits under any tax qualified benefit plan).[73]

On IKEA's Motion to Dismiss the question before the Court was, as it is now, whether Anastos's ERISA claim had accrued "as of the date of the execution" of the Release.[74] IKEA argued then, as it does now, that Anastos's ERISA claim could have been brought as of the date he executed the Release because, by that date, IKEA was unable to provide him the benefits to which he thought he was entitled.[75] Applying Eleventh Circuit precedent, *In re Managed Car*e, 756 F.3d 1222,

---

[73]   ECF 80, ¶ 22.

[74]   *See generally* ECF 56 (Order on Mot. to Dismiss).

[75]   *See generally id.*

1237 (11th Cir. 2014), the Court held that Anastos's claim accrued after he executed the Release, when his petition for benefits under the Policy was denied.[76]

IKEA offers no case law in support of a different outcome. However, after discovery, IKEA argues that Anastos's claim accrued in August 2017, when he first learned from IKEA's benefits contractor that he was unable to port his insurance.[77] Record evidence shows that Anastos exhausted all administrative remedies on November 12, 2018, upon his receipt of the letter from Simon Lowes.[78] The Court agrees with IKEA that "the heart of [ ] Anastos's claim is that IKEA violated ERISA when it did not allow him to 'port' his life insurance policy."[79] But Lowes was IKEA's Country Human Resources Manager, and his letter was clearly the "final say." Therefore, Anastos's claim, which accrued upon his receipt of Lowes's letter, is not precluded by the Release.

## ii.   The Policy Is Not ERISA-Covered.

IKEA next argues that, as a matter of law, the Policy is not a plan under ERISA. It is undisputed that the Plan is ERISA-covered. But, as Anastos concedes,

---

[76]   *See generally id.*

[77]   ECF 71-1, at 16.

[78]   ECF 72-16.

[79]   ECF 71-1, at 16 n.3.

the Plan only applied to "active employees," not retirees, and his theory of liability is that he was denied benefits under the Policy.[80] He avers that the Policy satisfies the elements of ERISA, and, therefore, it is an ERISA-covered plan.

ERISA covers two types of employee benefit plans: welfare plans and pension plans. 29 U.S.C. § 1002(1)–(2)(A). IKEA appears to argue that the Policy does not meet the requirements for a pension plan because it does not provide retirement income to employees or result in a deferral of income by employees.[81] Anastos concedes that the Policy is not a pension plan, but instead argues that it constitutes an employee benefits welfare plan, *id.* § 1002(1), so IKEA's discussion of pension benefit plans is out-of-place.[82] The Court agrees with Anastos that the Policy's purpose is not to provide retirement income to employees or defer income to employees. *Cf. Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016) (citing *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) ("The words 'provides retirement income' patently refer only to plans designed for the purpose of paying retirement income whether as a result of their express terms or surrounding

---

[80]   ECF 40, ¶¶ 85–89.

[81]   ECF 71, at 18.

[82]   *See* ECF 87, at 5; *see also* ECF 40, ¶¶ 51–52.

circumstances.")). If it were ERISA-covered, the Policy could only be a welfare benefits plan.

To prevail on an ERISA claim, Anastos must first demonstrate that an ERISA-covered benefit plan exists. *See Donovan v. Dillingham*, 688 F.2d 1367, 1370 (11th Cir. 1982); *Gilliland v. Air Line Pilots Ass'n Int'l*, 741 F. Supp. 2d 1334, 1344 (N.D. Ga. 2009), *aff'd sub nom. Gilliland v. Air Line Pilots Ass'n*, 396 F. App'x 655 (11th Cir. 2010). Under *Donovan*,[83] to establish that the Policy was ERISA-covered, Anastos must prove that it was: (1) a "plan, fund, or program" (2) established or maintained (3) by [IKEA] (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits; (5) to participants or their beneficiaries." 688 F.2d at 1371. Collectively, the Court refers to these criteria as the "*Donovan* Prerequisites." Of the five *Donovan* Prerequisites, only the first two are in dispute.

---

[83] The parties agree that *Donovan* is the controlling case. *See* ECF 71-1; ECF 87, at 6, 14 ("While *Donovan* . . . is on point, the analysis in that case fully supports a determination that IKEA's term life insurance continuation benefit is an ERISA benefit.").

If the evidence satisfies the *Donovan* Prerequisites, the Policy is "governed by ERISA whether or not the parties wish to be subject to ERISA." *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1049 n.11 (10th Cir. 1992). Conversely, if Anastos fails to meet any of the *Donovan* Prerequisites, his ERISA claim fails as a matter of law. *Cf. Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 604 (6th Cir. 1999) (affirming the district court's grant of summary judgment for the defendant where the putative plan and surrounding circumstances failed to meet at least two of the *Donovan* Prerequisites and the plaintiff, therefore, could not sustain a viable ERISA claim).

Because the first two *Donovan* Prerequisites are not defined in the statute, courts have developed general guidelines to use in determining whether a plan has been established, with or without an associated writing. 688 F.2d at 1373. These guidelines are discussed below in conjunction with the record evidence. Because the Policy is neither a "plan" nor has it been "established or maintained," the Policy is not ERISA-covered, and Anastos's claim fails as a matter of law.

### a.     The Policy Is Not a "Plan" Under ERISA.

With respect to the first *Donovan* Prerequisite, the Eleventh Circuit has annunciated four "Plan Factors": "At a minimum . . . a 'plan, fund, or program' under ERISA implies the existence of intended benefits, intended beneficiaries, a

source of financing, and a procedure to apply for and collect benefits." *Id.* at 1372. In addition to the minimum Plan Factors, courts recognize other criteria that bear on whether an ERISA plan exists. These include "(1) the amount of discretion involved in disbursing the benefits; (2) whether the benefits are disbursed on an ongoing or one-time basis; (3) whether the obligation to pay benefits is triggered by a single event; and (4) whether the employer assumed a long-term obligation to review claims and make payments." *Gilliland*, 741 F. Supp. 2d at 1345 (citing *Shaw's Supermarkets, Inc.*, 405 F. Supp. 2d 124, 130–31 (D. Mass. 2005)). Most importantly, "a 'plan, fund, or program' under ERISA is established if, from the surrounding circumstances, a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan*, 688 F.2d at 1373. This comports with ERISA's underlying policy, which "is built around reliance on the face of written plan documents." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013).

Though the Policy arguably spells out the first two Plan Factors—the intended benefits (*i.e.*, an option for the "continuation" of an employee's insurance benefits after retirement) and the intended beneficiaries (*i.e.*, employees "fifty-nine and a half  years of age or more . . . having worked a minimum of (10) years of

service, OR . . . any age [with] a minimum of 20 years of employment")[84]—there is no evidence in the Policy or accompanying FAQ regarding a source of financing or a procedure to apply for and collect benefits.

### 1.   A Reasonable Person Would Not Understand the Source of Financing.

First, a reasonable person would not understand the source of financing from the Policy's face. Indeed, the Policy repeatedly refers to the fringe benefits included in the Policy as "non-financial."[85] The Policy does not mention that IKEA purchases insurance for retirees or pays any portion of the rate that the "insurance vendor" charges. The Policy's FAQ mentions that retirees "will be given the option to convert (basic life) or port (supplemental life)."[86] But, even construing all inferences in Anastos's favor, the FAQ only suggests that IKEA would partially finance retirees' supplemental life insurance insofar as the insurance vendor would charge retirees group rates; this would not sustain Anastos's claim with respect to the basic life insurance or dependent insurance he believes is due. And, even taking this inference as true, Anastos offers no case law showing that this evidences the third Plan Factor, and the Court knows of none.

---

84   ECF 71-3, at 2.

85   *Id.*

86   ECF 72-4, at 2.

In an effort to prove that the Policy identified the source of financing, Anastos identifies a document attached to an email describing group rates for insurance coverage under the Plan.[87] However, as noted above, Anastos sought benefits under the *Policy*, not the *Plan*. The Court agrees with IKEA: "Anastos cannot rely on the source of funding for the [Plan] to suggest that the [Policy] is somehow a distinct plan" under ERISA.[88] None of Anastos's case law refutes this commonsense conclusion.[89]

### 2.     A Reasonable Person Would Not Ascertain How to Collect Benefits.

Nor is there evidence from which a reasonable person could ascertain the procedure to apply for and collect benefits. *Id.* The Policy merely indicates that, "[w]ithin 7–10 business days of retirement, retirees will receive information" about continuing their life insurance, and that, in most cases, the "options are guaranteed issue."[90] From this information, Anastos concludes that a reasonable person would

---

[87]   *See* ECF 87, at 9 (citing ECF 85-8).

[88]   ECF 89, at 13–14.

[89]   *Cf.* ECF 87, at 9–10 (collecting inapposite cases).

[90]   ECF 72-3, at 3.

understand the procedures for receiving benefits under the Policy.[91] But that evidence is too indefinite to satisfy the fourth Plan Factor as a matter of law.

*Williams v. Wright* illustrates why. 927 F.2d 1540, 1542 n.3, 1544–45 (11th Cir. 1991). There, the Eleventh Circuit considered whether a company's retirement letter, which provided for "an uninterrupted continuation of cash as [the plaintiff] gradually alter[ed] [his] work schedule to a retirement status" and promised to "issue [ ] a check in the amount of $500.00 each month, on the first of each month," met the fourth Plan Factor under *Donovan*. *Id.* The Eleventh Circuit reversed the district court's grant of summary judgment for the defendant, finding that the procedure for receiving benefits outlined in the letter, which would last "until [the plaintiff's] death or [he] [had] no use for them," was sufficiently ascertainable. *Id.* at 1545.

The letter in *Williams* stands in stark contrast to the Policy. The Policy promises only that the insurance vendor, not IKEA, would provide Anastos with "information," and that "[m]ost," not all, options "[were] guaranteed issue."[92] The Policy does not define the benefits, and it is utterly devoid of detail regarding the procedure for receiving benefits. It is unclear how the benefits would be paid out,

---

91   ECF 87, at 10.

92   ECF 72-3, at 3.

let alone which "insurance vendor" would administer the Policy. It did not include information about policy rates or the application process for insurance options that might not be guaranteed issue. And the Policy was silent about which entity would evaluate claims and appeals (*i.e.*, IKEA or the insurance administrator), let alone *how* claims should be made or would be reviewed. *Cf. Citarella v. Goldleaf Fin. Sols., Inc.*, Civ. A. No. 1:08-CV-2204-JEC, 2009 WL 3029760, at *4 (N.D. Ga. Sept. 21, 2009) (finding an agreement was not an employee benefit plan because, among other reasons, it failed to document procedures for making or reviewing claims).

Accordingly, because Anastos has failed to establish two Plan Factors, the first *Donovan* Prerequisite is unmet, and Anastos's ERISA claim fails as a matter of law.

### b.  The Policy Has Not Been "Established or Maintained" as an ERISA Plan.

With regard to the second *Donovan* Prerequisite—whether the defendants "established or maintained" a plan—the Eleventh Circuit has annunciated seven factors (the *Butero* Factors) to consider. *See Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1265 (11th Cir. 2004) (citing *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1214–15 (11th Cir. 1999)) (noting that the Eleventh Circuit evaluates whether a plan has been *maintained* by applying the same *Butero* Factors used to evaluate whether a plan has been *established*). The *Butero* Factors include: "(1) the

employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of a fund to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence; (6) the reasonable understanding of employees; and (7) the employer's intent." *Id.* (citing *Butero*, 174 F.3d at 1215).

In response to IKEA's argument that Anastos has not shown that IKEA "established or maintained" the Policy as an ERISA-covered plan, Anastos argues only that "[i]t is undisputed that between 2015 and [his] retirement . . . the [Policy] was iterated in [IKEA's] online resources, and amended in 2017 solely to expand the class of eligible participants."[93] Because the same evidence bears on multiple factors, the Court discusses various *Butero* Factors in tandem.

First, there is no evidence that IKEA distributed any internal documents suggesting that it intended the Policy to be an ERISA-covered plan. The only admissible documentary evidence about the Policy's makeup or purpose is the Policy itself.

Anastos claims that the Policy was formulated as an ERISA-covered plan over a two-year process before it was eventually approved by IKEA's chief

---

[93]   ECF 87, at 11–12.

executive officer and his management team, and promulgated to employees.[94]

Further, Anastos submitted a declaration from Ella Hullfish, IKEA's former United

States Benefits and Compensation Manager,[95] who indicated that Erika Lane, her

successor, "completed the negotiations with Met[L]ife [regarding the Policy], and

[ ] developed the administrative oversight of this benefit between [IKEA] and

MetLife." The Court credits Anastos's account of the events leading up to the

Policy's adoption and promulgation. However, it seems that Anastos failed to

discover any internal documents containing IKEA's representations of the Policy

or evincing IKEA's intent behind the Policy, let alone communications with Lane

about the Policy, documents detailing IKEA's administrative oversight of the

Policy (*e.g.*, pricing negotiations, retiree claims or appeals, etc.), documents

showing the establishment of a fund to effectuate the Policy, or evidence of actual

payment of benefits under the Policy.[96]

Anastos highlights IKEA's internal communication, detailed above, aimed

at clarifying the Policy in the wake of Anastos's conversation with IKEA's benefits

---

[94]   *Id.* at 11.

[95]   ECF 83, ¶ 5.

[96]   It appears that Anastos never deposed Lane or Joe Esposito, an IKEA employee who helped create the Policy and was "intimately involved in [IKEA]'s compensation practice and policy." *Id.* ¶ 15.

personnel. He argues that these "curative action[s] . . . establish fault on [IKEA's] part."[97] He further avers that, because IKEA did not act to change the Policy's language from "option to *continue*" to "option to *convert*" until October 23, 2018,[98] IKEA "fail[ed] to correct known perceptions of the [Policy]."[99] This argument is unsuccessful.

The evidence shows that IKEA time and again corrected Anastos's belief that the Policy allowed him to port his insurance purchased under the Plan.[100] IKEA also moved swiftly, changing "continue" to "convert" less than two months after it internally recognized the Policy's alleged inconsistency and nearly one month before Anastos's ERISA claim accrued. Furthermore, it is a defendant's "failure to correct known perceptions," not its effort to correct misperceptions, that proves the defendant established and maintained an employee welfare benefit plan under ERISA. *Anderson*, 369 F.3d at 1266. Anastos's position would discourage corrective action, which neither comports with this Circuit's law nor makes for sound public policy.

---

97   ECF 87, at 16.

98   ECF 85-7 (emphasis added).

99   ECF 87, at 16.

100   *See supra* Sections I.D., I.E.

Finally, Anastos maintains that "[t]he only information presented to IKEA employees was the [Policy,] . . . on which he relied" when he decided to retire.[101] However, the evidence shows that Anastos also discussed the Policy with Scoggins, IKEA's benefits contractor.[102] Although Scoggins relayed partially incorrect information to Anastos, she confirmed information fatal to Anastos's ERISA cause of action: Plan insurance policies were *not portability eligible* under the Policy.[103]

The latest date by which Anastos can logically claim he relied on the Policy to inform his choice to retire is October 5, 2017, the date he executed the Offer.[104] By that time, Scoggins had informed Anastos that his understanding of the Policy was incorrect, and that he was not entitled to port his insurance at IKEA's group rates. Anastos contacted Hullfish, who was integrally involved in the creation of the Policy,[105] and she advised him to confirm Scoggins's account with MetLife. But Anastos never contacted MetLife or IKEA to confirm or dispute Scoggins's explanation of the Policy before he executed the Offer.

---

[101]  ECF 40, ¶ 53.

[102]  *See generally* ECF 72-5.

[103]  *Id.* at 2.

[104]  ECF 80, ¶ 33.

[105]  *Id.*

Though Anastos insists that Amy Vernon confirmed his understanding of the Policy in April 2018 and, again, on May 3, 2018, he had by then long since accepted the Offer and decided to retire. Simply put, his late discussions with Vernon could not have plausibly affected a choice he had already made.[106] Nor could the MetLife Letter, the Amended Insurance Package, or any back-and-forth with or correspondence from IKEA thereafter. At bottom, Anastos made the choice to retire with exactly two datapoints in hand: (1) the Policy's scant terms, and (2) Scoggins's explanation that his insurance was not portable and his policies under the Plan would end at retirement, leaving only the option to convert them.

---

[106] For this reason, the Court need not address IKEA's sham affidavit argument in great detail, except to say that Anastos's declaration did not contradict his deposition testimony and, therefore, would not trigger the sham affidavit rule. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986). IKEA misapplies the rule where Anastos's declaration is merely uncorroborated and self-serving. The Eleventh Circuit has repeatedly held that a self-serving declaration based on personal knowledge can defeat summary judgment, even if the district court doubts its veracity. *See, e.g.*, *United States v. Stein*, 881 F.3d 853, 856 (11th Cir. 2018) (holding that "an affidavit which satisfies Rule 56 of the Federal Rules of Civil Procedure may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated"); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."); *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."), *modified on other grounds on denial of reh'g*, 425 F.3d 1292 (11th Cir. 2005).

The Court finds as a matter of law that no reasonable person with this information could have ascertained that IKEA established or maintained the Policy as an ERISA-covered plan.

Because both the first and second *Donovan* Prerequisites are unmet, IKEA is entitled to summary judgment. *See Williams v. WCI Steel Co.*, Inc., 170 F.3d 598, 604 (6th Cir. 1999) ("[B]ecause the Memorandum Agreement fails at least two of the [Plan] [F]actors, we will affirm the conclusion of the district court that plaintiffs did not state a viable claim under ERISA.").

## III. Conclusion

IKEA's summary judgment motion [ECF 71] and motion for leave to file matters under seal [ECF 74] are **GRANTED**.[107] Anastos's motion to strike IKEA's notice of supplemental authority [ECF 92] is **DENIED**. The Clerk is **DIRECTED** to enter judgment against Anastos and close the close.

**SO ORDERED** this 30th day of September, 2022.

Steven D. Grimberg
United States District Court Judge

---

[107] The Court takes no position as to whether Anastos is entitled to bring state law claims arising out of the facts described in this Order.